NATHAN MFG. CO. v. DELAWARE, L. & W. R. CO. et al.

(Circuit Court of Appeals, Second Circuit. November 7, 1907.)

### No. 15.

PATENTS—INVENTION—LUBRICATOR FOR LOCOMOTIVE ENGINES.

The Woods patent, No. 645,026, for a lubricator to supply oil to the valves and cylinders of locomotive engines, claims 1 and 2 which cover broadly means by which the feed is increased when the throttle is open and decreased when the throttle is closed by the use of two distinct passages, one constant and one shifting in size by the automatic action of a valve governed by the steam pressure, in view of the prior art, which shows a single passage made larger or smaller by the movement of a valve, and especially of the McCoy patent, No. 179,585, are void, as broader than the invention.

Appeal from the Circuit Court of the United States for the Northern District of New York.

The bill is in the usual form, charging infringement by the defendants (respectively, user and manufacturer) of complainant's patent No. 645,026, issued to one Woods March 6, 1900, for an improvement in lubricators.

For opinion below, see 146 Fed. 252.

George S. Payson (John B. Corliss, of counsel), for appellants.
Edmund Wetmore, for appellee.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

PER CURIAM. The lubricators with which the patent is concerned are those which supply oil to the valves and cylinders of locomotive engines, which are continually surrounded by an atmosphere of steam, and which are therefore not accessible while the engine is in

operation. They include a reservoir of oil, which is fed forward uniformly and continuously to the parts of the engine where it is required. The type of lubricator to which complainant's device is applied is what is known as "hydrostatic," because it depends for its operation on the force exerted by a column of water.

An illustrative drawing which is found in complainant's brief will make a condensed description of the operation of lubricators of this type more intelligible.

Steam from the boiler is admitted through the steam pipe, A, into the condenser, B, where it condenses into water which flows through the water pipe, D, into the bottom of the oil reservoir, C. As it rises therein it lifts the oil till the latter flows over the top of the oil tube,

E. and down the same to the bottom of the sight feed glass, F. This glass is filled with water of condensation. The oil rises through it drop by drop, and, accompanied by the steam, flows out through the small or "choke" passage, H, into the oil or tallow pipe, J, and thence to the steam chest and cylinder of the engine. The equalizing pipe, G, leads steam at boiler pressure from the steam pipe or condenser to meet the discharge end of the body of water and oil contained in the condenser and reservoir and the connecting channels to the exit at the choke passage. When the full head of steam is admitted to the cylinder from the boiler, as when the engine is running at full speed, the tallow pipe is full of steam at boiler pressure. When, however, the steam is shut off from the cylinder, as when the engine is running down a steep grade or slowing up to stop at a station, the pressure in the tallow pipe is much reduced, and the oil which is entering the receiving end of the tallow pipe through the choke passage with boiler pressure behind it has a tendency to be forced in in much larger quantities than when the tallow pipe is filled with steam at boiler pressure. This produced unfortunate results, which need not be detailed. The problem presented was this: If the choke passage were made large enough to insure a flow of oil when there was full back pressure in the tallow pipe, it would be liable to allow an excess of oil when the steam was shut off from the tallow pipe. Indeed, in the latter case the oil might be sucked through the choke passage so rapidly as to empty the reservoir. Complainant concedes that this difficulty had been recognized and means devised to meet it before Woods' invention, and contends that what Woods did was to invent a new and more efficient means for accomplishing this purpose.

Turning now to the patent, we find this statement:

"Owing to the fact that the steam supply for the lubricator comes direct from the boiler, it is evident that the escape of steam and oil through the upper sight brackets is practically continuous, even though the throttle valve be closed and the engine motionless. It has been found, however, that when the throttle valve is opened and steam admitted to the steam chest the small volume of steam passing through the nozzles condenses within the oil pipes, resulting in a reduced pressure therein. The reduced pressure is not sufficient to resist the back pressure of steam from the steam chest, with the result that the feed of the lubricator becomes irregular and eventually stops altogether. It is the object of my invention to overcome this effect in a simple and reliable manner. To this end I combine with the lubricator and the oil or tallow pipe leading therefrom to the cylinder, * * * through which pipe there is a constant flow of steam and oil in limited quantity to the cylinder through the usual plug or nozzle, or its equivalent, a valve or piston plug, preferably of the differential type, controlling a steam passage from the lubricator side of the apparatus to the tallow pipe and adapted to be operated by the back pressure from the cylinder. * * * Thus not only is the back pressure from the cylinder neutralized or equalized by the additional volume of steam admitted at the lubricator end of the tallow pipe, but the oil feed is increased also. In other words, the feed is increased when the throttle is open and decreased when the throttle is closed, because in the latter case the oil can pass through the small constantly open choke passage or plug only. These features, broadly considered, are not new with me, as a lubricating apparatus embodying said characteristics is shown and described in United States patent No. 267,430, granted to R. J. Hoffman on January 14, 1882."

The patentee then describes in detail the "piston plug, preferably of the differential type" above referred to. It is a longitudinally moving

valve provided with a restricted constantly open port or passage (the choke passage) through it, for a continuous supply of steam and oil in minimum quantity from the lubricator to the tallow pipe, and with additional ports or passages (distinct and separate from the constantly open minimum supply port) which are open for the passage of an additional supply of steam or steam and oil only when the piston valve is operated to move by the back pressure from the cylinder. Thus the piston valve, so far as its restricted, constantly open passage is concerned, corresponds in function to the choke plug usually employed at the lubricator end of the tallow pipe, while, so far as its additional ports are concerned, it is a valve which controls said ports and opens them only when operated so to do by back pressure from the cylinder. After describing in detail the structure and operation of this form of valve, the patentee says:

"I believe myself to be the first to have devised a lubricating apparatus provided with suitable cylinder and equalizing pipe connections wherein the duct connecting the lubricator and the steam chest at any point in the length of the duct is provided with a minimum supply choked passage, a relatively larger by-passage separate and distinct from the minimum supply choked passage, and a valve for controlling said by-passage automatically operated by variations of pressure within the duct."

The claims in controversy are:

"1. In a lubricating apparatus provided with suitable boiler, cylinder, and equalizing pipe connections, and in combination with the lubricator and the steam chest or cylinder, a duct connecting the same containing a minimum supply choked passage, a relatively larger by-passage, separate and distinct from the minimum supply choked passage, and a valve for controlling said by-passage automatically operated by variations in pressure within the duct at the times and in the manner substantially as hereinbefore set forth.

"2. In a lubricating apparatus provided with suitable boiler, cylinder, and equalizing pipe connections, a casing communicating with the delivery end of the lubricator, provided with a choked or very small permanently open passage for continuous flow of steam and oil in restricted quantity from the lubricator to the steam chest, and with a valve-controlled by-passage separate and distinct from the minimum supply passage, for permitting an increased flow of steam and oil from the lubricator through the casing into the steam chest, substantially as hereinbefore set forth."

The second claim refers substantially to the same elements as the first claim, and differs from the same in language accentuating more particularly that the casing is provided with a choked or very small permanently open passage and with a valve-controlled by-passage separate and distinct from the minimum supply passage. It does not state how the controlling valve is operated. As will be noted in the above excerpt, Woods admits that certain features of improvement, broadly considered, are not new with him, but found in Hoffman's patent. Defendants' expert refers to Hoffman to and Schmitt (No. 354,353) as "containing each the elements of the combination set forth in the first claim combined in substantially the same way." We are not persuaded to accept his theory of the operation of the Schmitt device, and therefore will discuss the Hoffman patent only. Hoffman and Woods both struggled with the same problem and sought to solve it by different means. Hoffman states that problem in his specification, as follows:

"Locomotive engines vary * * * greatly and constantly in the steam **pressure.** When going down grades steam is shut off wholly, and between this and the full head there are all intermediate degrees of pressure. This **great and perpetual variation** prevents the use of the ordinary steam feed. Hence it happens that when the steam is shut off the engine runs without that lubrication which the moisture of the steam supplies, and in consequence, not only is the lubrication less uniform, but more oil is needed. To overcome this irregularity of steam pressure and to produce a uniform and constant steam feed of the lubricant are my objects in the invention set forth. My invention consists principally of a constant steam feed lubrication in connection with an engine subject to variable work. It consists, further, of an automatic valve and an arrangement of steam pipes in relation to the lubricator, the steam boiler, and the cylinders, whereby the back pressure of the steam in the cylinder is made to regulate the flow of steam which carries the lubricant to the working parts of the engine."

Fig. 3.

Figure 3 of the patent drawings shows Hoffman's device.

Steam comes from the boiler through pipe 3, and oil from the oil reservoir through pipe 2, into the valve chamber above the valve; thence it passes through ports, h, h, by a single passage to the tallow pipe, 1. This single passage is lettered, o, through which the valve stem moves up and down. When back pressure is cut off the valve, f, moves down, obstructing the ports, h, so as to reduce the flow through them. When steam is again admitted to the cylinder (and tallow pipe) the back pressure and the spring lift the valve uncovering the ports, h, h, and enlarging the passage for the oil. Thus, in the words of Woods' specification, "the feed is increased when the throttle is open and decreased when the throttle is closed," and, "broadly considered," a means for overcoming the existing difficulty is shown. The means differs from Woods', however, in what appears to be an important particular. As indicated in the drawing (Fig. 3) it would seem to be possible for the valve to be forced by boiler pressure down so far as to close the ports, h, h, completely, so that there would be no fixed minimum passage at all. Complainant contends that the Hoffman patent should be so construed, but we are not inclined to accept such construction. The specification states that "when the locomotive is still this valve is set for a certain amount of flow," and it is apparent that the threaded supplemental stem, m, may be set at such an elevation that, when the valve stem abuts upon it, the valve is checked in its descent so as to leave a predetermined minimum passage. This method of predetermination, however, seems to be objectionable. Complainant's expert, a practical locomotive engineer testified:

"By tedious experiments, manufacturers of lubricators have determined the proper and useful size for the permanently open minimum supply choked

passage which under ordinary variations of pressure during the service of a locomotive engine will enable the lubricator to deliver to the steam chest and cylinders of the engine the oil at a practically uniform rate. No useful result can be obtained by decreasing the size of the minimum opening below the size determined by the manufacturer; but, on the other hand, a very slight increase in the size of the minimum opening will cause the lubricator to deliver oil in wasteful quantities when the throttle is closed. * * * It is a well-recognized necessity on the part of railroads to maintain the choke plug of a lubricator forming the minimum supply passage of the size as determined and supplied to them by the manufacturers, and some railroads have established quite elaborate means and issued very strict instructions" to that end. "I think, for these reasons, that the adjustment of an important passage like that of the choke plug cannot be left to the judgment of the operator, and that a device which would depend upon such adjustment is unreliable and impracticable."

There is corroborating testimony, and none which substantially contradicts these statements. Manifestly the Woods' valve, which has one fixed, predetermined, minimum passage through it always open, and other separate and distinct passages through the valve which are opened or shut as its position shifts, is a distinct means of regulating the flow of oil from that shown in Hoffman. Quite possibly it is an improvement on Hoffman, and, for anything shown in this record, it appears to present patentable novelty. That precise means is an element of claims 3, 4, 5, and 6. These claims were the only ones asked for when application was filed. The broader claims 1 and 2, and the broad statement of invention at the close of the specification, were inserted while the application was pending in the Patent Office.

The device of the defendant differs from the "piston plug, preferably of the differential type," which is shown in Woods' patent. The predetermined minimum passage does not pass through the valve, but is cut through the wall of the casing. Near it, also through the casing, is cut another passage, the larger one, which is opened and closed by the movement of a ball valve, which is forced over the mouth of the passage by direct boiler pressure, when back pressure is withdrawn, and which, when back pressure is restored, rolls off its seat by gravity. Complainant does not charge infringement of the last four claims, and defendants concede that they infringe the first two claims, if these are held valid, for they cover broadly the two passages separate and distinct, the larger one automatically controlled by any kind of valve. We have reached the conclusion that Woods was not entitled to these broad claims in view of the state of the art.

Defendants refer to three patents (Stewart, 125,704; McCoy, 179,585; and McCoy, 261,166), the first and third of which we do not find especially persuasive. The earlier McCoy patent, however, shows an oil reservoir from which the oil flows into the steam pipe through two passages, of which the minimum, predetermined in size, and never increased or diminished by the motion of the valve, is drilled through the valve itself. The other larger passage, separate and distinct from the minimum, is opened and closed by the valve movement. This patent is in the lubricator art; but defendants contend is not a good reference, because it is concerned with a different class of apparatus, known as "displacement lubricators." In these the steam enters and the oil flows out through the same pipe. The operation depends upon

the pulsation of pressure of the steam in the space of the lubricator. When the pressure is at the highest point a certain quantity of steam flows from the space to be lubricated into the lubricator, and is there condensed. The water of condensation, falling to the bottom of the oil chamber, displaces an equal quantity of oil, which, when pressure in the steam space is reduced, flows from the lubricator to this space. Thus oil is fed in regulated quantities, the quantity depending on the number of pulsations per minute, and the adjustment of the parts. McCoy drilled his smaller passage through the valve plug primarily for the purpose of pouring cold oil through it when the entire apparatus was cut off and the top removed; but study of the structure seems to indicate that when the steam is on hot oil will flow through it, as well as through the larger passage, which is opened and closed as the valve flutters upon its seat.

We are not satisfied from the rebuttal testimony of Kaczander (complainant's expert) that it will not flow in this way. The most that he says is that the small passage would have to be made so large that there would probably be a waste of oil. But that does not eliminate this patent from the prior art. No doubt Woods' device is much more efficacious; but so far as that efficiency depends on the use broadly of two distinct passages, one constant and one shifting in size, instead of a single passage made larger or smaller by the movement of a valve, he cannot, in view of what McCoy showed, hold the art tributary to himself, however different may be the arrangement of parts which others use to regulate the ports. For these reasons, we are of the opinion that claims 1 and 2 are broader than the patentee's invention and cannot be sustained.

The decree is reversed, with costs, and cause remanded, with instructions to dismiss the bill.